■ In the Matter of PHERBO REALTY CORPORATION, Respondent, v BOARD OF ASSESSORS OF THE TOWN OF FISHKILL et al., Appellants. — In consolidated proceedings pursuant to article 7 of the Real Property Tax Law, the appeal is from so much of a judgment of the Supreme Court, Dutchess County (Burchell, J.), dated January 5, 1981, as reduced the assessments for each of the tax years under review. Judgment modified, on the law and the facts, by deleting the provisions reducing the assessments and substituting provisions adjusting the assessments in accordance with the memorandum of this court. As so modified, judgment affirmed insofar as appealed from, with costs to appellants, and case remitted to Special Term for entry of an appropriate amended judgment fixing the assessments in accordance herewith. The subject real property is known as Block No. 6255, Lot Nos. 080450 and 115425, on the official Tax Map of the Town of Fishkill. It constitutes approximately 13.4 acres and is improved with

a two-story department store constructed between 1972 and 1974. All of the improvements are located on Lot No. 080450. The assessments under review are for the tax years 1975/1976 through and including 1978/1979. The petitions allege that the assessments were erroneous by reason of inequality and overvaluation. Appellants contend: (1) that Special Term's failure to give any recognition to the cost of *construction* was reversible error; (2) that the petition for 1975/1976 should be dismissed for petitioner's "refusal" to produce requested information before the board of assessment review; and (3) that petitioner's appraisal should have been stricken because, prior to the trial court's implied grant of petitioner's motion to amend its appraisal so as to permit late submission of a grid adjustment for its lease comparables, petitioner's appraisal had no such grid. We find no merit to appellants' second and third contentions. However, we agree with appellants that the cost of construction should have been taken into consideration for the tax years under review, and the reduced assessments fixed by Special Term should be modified upwards. Summarized, the total assessments under review are:

|  | 1975/1976 - 1977/1978 | 1978/1979 |
|---|---|---|
| Land | $ 249,500 | $ 249,500 |
| Improvements | 3,405,800 | 3,555,800 |
| Total | $ 3,655,300 | $ 3,805,300. |

The assessments were fractional, necessitating application of equalization rates, as will be noted, *infra*.

Petitioner's expert appraised the market value of the combined properties as follows:

| YEAR | LAND | IMPROVEMENT | TOTAL |
|---|---|---|---|
| 1975/1976 | $470,000 | $2,660,000 | $3,130,000 |
| 1976/1977 | $515,000 | $2,720,000 | $3,235,000 |
| 1977/1978 | $515,000 | $2,745,000 | $3,260,000 |
| 1978/1979 | $515,000 | $2,700,000 | $3,215,000. |

Appellants' expert appraised the combined properties as follows:

| YEAR | LAND | IMPROVEMENT | TOTAL |
|---|---|---|---|
| 1975/1976 | $470,000 | $6,000,000 | $6,470,000 |
| 1976/1977 | $498,000 | $6,000,000 | $6,498,000 |
| 1977/1978 | $526,000 | $6,200,000 | $6,726,000 |
| 1978/1979 | $555,000 | $6,100,000 | $6,655,000. |

It was stipulated that the "construction costs" or "building costs" on the status dates under review were:

| YEAR | COST |
|---|---|
| 1975/1976 | $7,212,166 |
| 1976/1977 | $7,259,611 |
| 1977/1978 | $7,281,504 |
| 1978/1979 | $7,261,785. |

The parties agreed to utilization of the State equalization rate, although they differed as to the appropriate State rate for each of the tax years in issue.

Special Term's "fair market" ("actual") valuations and reductions in assessments were:

### FAIR MARKET VALUATIONS

| "TAX STATUS DATE | LAND | TOTAL |
| --- | --- | --- |
| "May 1, 1975 | $469,000 | $3,246,671 |
| "May 1, 1976 | $495,800 | $3,295,471 |
| "May 1, 1977 | $522,600 | $3,418,836 |
| "May 1, 1978 | $549,400 | $3,246,711"; |

### REDUCTIONS

| "TAX STATUS DATE | STATE EQUALIZATION RATE | DESCRIPTION | REDUCTION | FINAL TOTAL ASSESSMENT |
| --- | --- | --- | --- | --- |
| "May 1, 1975 | 88.09% | Lot 080450 | $ 739,808 | $2,859,992 |
| | | Lot 115425 | -0- | $ 55,500 |
| "May 1, 1976 | 77.89% | Lot 080450 | $1,032,957 | $2,566,843 |
| | | Lot 115425 | -0- | $ 55,500 |
| "May 1, 1977 | 71.59% | Lot 080450 | $1,152,256 | $2,447,544 |
| | | Lot 115425 | -0- | $ 55,500 |
| "May 1, 1978 | 69.08% | Lot 080450 | $1,506,973 | $2,242,827 |
| | | Lot 115425 | -0- | $ 55,500." |

We are in accord with Special Term's capitalization use and methodology, except that we find that the history of the property demonstrates that the court should have taken into consideration the costs of the improvement, which was constructed just prior to the tax years under review. We conclude that while the assessments should be reduced, the reductions should not be as much as those made by Special Term. Petitioner is a subsidiary of J. W. Mays Department Store (Mays). In 1971, National Merritt, Inc., a real estate corporation, wished to construct a shopping center on a large tract of land at the intersection of Interstate Highway 84 and Route 9, in the Town of Fishkill, Dutchess County. It suggested to Mays that it become an anchor store at the proposed shopping center. An agreement was entered into under which petitioner bought 13 acres adjoining the proposed center to construct a Mays store. In 1972, prior to construction, the Mays site was relocated at the subject tract "as part of a much larger shopping center concept." At the relocated site, however, problems were encountered with respect to the soil conditions, necessitating pilings and reinforced foundations. Petitioner commenced construction of the Mays store on June 26, 1972. By mid-1974 the store was nearing completion. National Merritt, however, had been encountering serious financial problems. In July, 1974, the neighboring center, a mall, which it had undertaken to complete, had not yet been completed and was then "about six months to a year overdue." The parties then entered into an agreement (dated July 2, 1974) which modified their earlier agreement of November 30, 1971. The modified agreement states that it had been determined that municipal sewage facilities are not available for the shopping center; that the developer is presently constructing a sewage treatment plant to service the developer's portion of the shopping center; and that petitioner could build its own sewage treatment plant to service the Mays store should the developer's sewage treatment plant not be completed. The modified agreement further provided that Mays' store would have its opening October 3, 1974 and that the developer would have at least 50% of the mall's stores open by that date. However, National Merritt's financial difficulty continued. In October, 1974, it filed a petition for an arrangement under chapter 11 of the Bankruptcy Act and came under the jurisdiction of the Bankruptcy Court. By October, 1974, the Mays store had

been completed; it had its opening that month. At this time, the condition of the neighboring shopping center (as testified to by Melvin M. Kazdin, attorney for petitioner) was as follows: "Most of the on-site and off-site work had been completed. The mall was not completed. There were no stores in the mall that were open. There was the other anchor store ['Lucky Platt, a Poughkeepsie small scale department store'] at the far end of the mall * * * either opened at that time or was about to open, but all of the stores lining the mall itself were not open. There was a convenience center here in which there was, as I recall, a supermarket and a paint store, and they were open." On February 9, 1976, the National Bank of Westchester, holder of the mortgage on the mall property, obtained an order of foreclosure and acquired title at the foreclosure sale. Thereafter, a new agreement, dated May 24, 1977, was executed by petitioner and National Bank of Westchester, which further modified the agreement of November 30, 1971. The new modification articulated petitioner's need to have the adjoining shopping center completed at the earliest possible time. The shopping center, however, did not have a grand opening until the spring of 1979 and petitioner was required to bear the full cost of constructing a sewage treatment plant. In valuing the subject property, petitioner's expert relied solely upon the capitalization of income method (building residual technique). Since the property was owner-occupied, he estimated its rental value by a study of comparable leases and by utilizing studies (Manuals) reporting the percentage of gross sales charged as rent for department stores in various areas of the United States. His final valuations have been noted above. Appellants' appraiser utilized the capitalization of income approach, deriving estimated rentals solely from comparable leases; he did not use the Manual approach (percent of gross sales method). His valuations under the income approach were:

| 1975/1976 | $4,600,000 |
| 1976/1977 | $4,750,000 |
| 1977/1978 | $5,100,000 |
| 1978/1979 | $5,100,000. |

He also reported valuations under a cost approach. It is manifest from his testimony, however, that his primary reliance was upon the capitalization of income approach and that he utilized his cost valuations merely as a source of an increment to his capitalization of income valuations. Thus, he testified:

"Q  So in your opinion, you don't believe the property was worth what it cost to build it, do you?

A  That's correct.

Q  And would you tell us how much weight you gave to the cost approach in this case?

A  I gave some weight. I don't know how I could express it, other than that. I had an estimated value by the income approach that I used, in which was also included some weight to the land value. I recognized that under the circumstances in the subject property, the income approach to value could not altogether entirely express a value that would reflect all of the elements in the Mays property, which is the subject here. So I looked to the cost approach for additional guidance and I increased my final estimate of value above that, which was indicated by the income approach toward the value indicated

by the cost approach, but some million to a million-and-a-half-dollars less than what was indicated actually by the cost approach.

Q Was that increase to the income valuation a subjective or objective decision?

A It was subjective. * * * I merely felt that the market value of this property had to be something greater than that indicated by the income approach. I had no other guide to that additional increment or range other than the cost approach. So I looked at the value by the cost approach. I was reluctant to conclude that the value was equivalent to that provided by the cost approach. So I merely selected a range of value somewhere between the two that satisfied me based upon my judgment in this case and my prior experience."

In *G.R.F., Inc. v Board of Assessors of County of Nassau* (41 NY2d 512, 514), the Court of Appeals noted: "The cost approach, which, among other things, ignores entirely factors like functional obsolescence, is useful principally, apart from specialties, to set a ceiling on valuation (see *Matter of 860 Fifth Ave. Corp. v Tax Comm.*, 8 NY2d 29, 32; see, also, 2 Orgel, Valuation Under Eminent Domain, § 199)." However, where a building is "well suited to the site" and was constructed close in time to the taxable years under review, "its actual cost of construction becomes a significant factor" (*Matter of 860 Fifth Ave. Corp. v Tax Comm. of City of N. Y.*, 8 NY2d 29, 32; *Matter of Stewart Tenants Corp. v Tax Comm. of City of N. Y.*, 25 AD2d 623; *Matter of Campagna v Tax Comm. of City of N. Y.*, 27 AD2d 807). At bar, Special Term noted that the subject development had been "fraught with difficulty. This included the bankruptcy of the shopping center developer, which imposed substantial additional expense for improvements on the petitioner. It also included substantial unanticipated construction costs. Most importantly, however, the bankruptcy of the shopping center developer left the shopping center with an extremely high vacancy rate during the years under review. The over-all traffic in and about petitioner's store was substantially lessened thereby reducing the effectiveness of merchandising efforts by petitioner. As a result, petitioner was left in a position of relative overkill, with a fixed overhead and reduced revenues." Accordingly, Special Term considered "the costs of the property" merely as a ceiling on value. It calculated its valuations solely on the capitalization of income method, deriving rental value by means of the percent (3%) of sales method (see *Matter of White Plains Props. Corp. v Tax Assessor of City of White Plains*, 71 AD2d 677, affd 50 NY2d 839; *Matter of B. Altman & Co. v City of White Plains*, 83 AD2d 879). Its valuations closely approximate those of petitioner's appraiser. In our opinion, Special Term erred in totally rejecting the cost evidence as a factor in its valuations. The subject building was newly constructed at the time of the tax years under review, and was suitable to the site. Thus, the costs should have been deemed a "significant factor". Although the costs may seem somewhat suspect because of the alleged expense for pilings and a sewage treatment plant, the record does not contain dollars and cents evidence of the amounts purportedly expended for those costs. Conversely, however, although the costs are a significant factor, the evidence clearly demonstrates that costs were not an overwhelmingly significant factor. Appellants' expert himself correctly viewed the cost evidence merely as a source of some upward adjustment of capitalizaton of income valuations (see *G.R.F., Inc. v Board of Assessors of County of Nassau*, 41 NY2d 512, *supra; Matter of Merrick Holding Corp. v Board of Assessors of County of*

*Nassau,* 45 NY2d 538). In *People ex rel. MacCracken v Miller* (291 NY 55, 61), the Court of Appeals stated the following with respect to the Appellate Division's review powers in tax certiorari cases: " 'It may not set aside a finding of value made at Special Term, unless such finding is based upon erroneous theory of law or erroneous ruling in the admission or exclusion of evidence, or *unless it appears that the court at Special Term has failed to give to conflicting evidence the relative weight which it should have* and thus has arrived at a value which is excessive or inadequate.' (Italics are new.) (*Matter of City of New York [Newtown Creek]* [28 NY 493] *supra* at p. 497.)" At bar, Special Term erred to the extent of giving no weight to the cost evidence, and thus failing to give to the conflicting evidence the weight it should have and arriving at inadequate values with respect to the improvement. We find no basis for disagreeing with its land value findings.

On all of the evidence, including the costs of the improvement, we find the building value to be $4,000,000 for 1975/1976, with $200,000 per year depreciation in each of the ensuing years.

Accordingly, the fair market valuations should be fixed as follows:

| TAX STATUS DATE | LAND | IMPROVEMENT | TOTAL |
| --- | --- | --- | --- |
| May 1, 1975 | $469,000 | $4,000,000 | $4,469,000 |
| May 1, 1976 | $495,800 | $3,800,000 | $4,295,800 |
| May 1, 1977 | $522,600 | $3,600,000 | $4,122,600 |
| May 1, 1978 | $549,400 | $3,400,000 | $3,949,400. |

The case should be remitted to Special Term for application to our modified valuations of the equalization rates used in Special Term's decision, and entry of an amended judgment fixing the assessments accordingly. Gibbons, J. P., Weinstein, Bracken and Boyers, JJ., concur.